Argued July 9, affirmed September 25, 1975

RICE, *Respondent, v.* HYSTER COMPANY ET AL,
*Appellants.*

540 P2d 989

*Patrick Ford,* of Ford & Cowling, Medford, argued the cause and filed the briefs for appellants.

*Robert H. Grant,* of Grant & Ferguson, Medford, argued the cause and filed the brief for respondent.

TONGUE, J.

This is an action for personal injuries sustained by a workman on a construction job in Medford who was "riding on the forks" of a forklift truck when either the forks, the "intermediate upright," or both, suddenly dropped and he fell off. Defendants include the manufacturer and the supplier of the lift truck. The complaint includes counts in both negligence and strict products liability. The case was tried by a jury, which returned a plaintiff's verdict for $175,759. Defendants appeal from the resulting judgment. We affirm.

■ Because defendants' assignments of error include the denial of their motions for nonsuit and directed verdict we have reviewed the entire and lengthy record, bearing in mind that in such a case plaintiff is entitled to the benefit of all conflicts in the evidence, as well as all favorable inferences which can reasonably be drawn from such evidence. See *Pakos v. Clark,* 253 Or 113, 116, 453 P2d 682 (1969).

*The facts.*

(1) *The forklift truck and its "three stage," 30-foot "tower."*

The forklift truck and "tower" were manufactured by defendant Hyster Company in 1970 and then delivered to defendant Hyster Sales Company, a wholly owned subsidiary. The two defendants were treated as one entity for the purposes of this case. The "tower" extends to a height of 30 feet. It consists of three upright "stages" (inner, intermediate and outer) which telescope into each other. The hoisting mechanism consists of a hydraulic cylinder which raises and lowers a carriage by the use of chains. The forks are attached to the carriage.

The lift truck was leased by Hyster Sales Company to R. M. McGlohn, a subcontractor on a con-

struction job in Medford, who loaned it to Medford Construction Co., plaintiff's employer, with the knowledge and approval of Hyster Sales Company.

The only previous use of the equipment was during its lease to ABC Television in Portland. It was then used to hoist a platform with television cameras and operators for the filming of a golf tournament.

## (2) *Previous difficulties and repairs.*

During its use on the construction job prior to plaintiff's injury the equipment malfunctioned on three or four occasions when the second "stage" of the tower would "hang up" and either that stage or the forks would then drop from three to five feet with a loud noise, jarring the "whole machine" and causing it to shake. On one of those occasions a "latch" sheared off. On another occasion a bolt head or nut sheared off.

On those occasions Hyster Sales Company was called and sent a mechanic to repair the equipment. Once the Hyster repairman found that one "latch" had a little "lip" broken. In addition to repairing it he welded a piece on the "channel support plate" because he found that the original plate was bent. There was testimony that if the "latches" were out of repair this would permit a drop of the "stage" of the "upright." There was also testimony that after these repairs the Hyster repairman said that the equipment had been fixed and that it was all right to operate.

## (3) *The accident.*

On December 31, 1970, during the course of a construction job the foreman of Medford Construction Co. needed a pipe clamp which had been left on the roof of the building. The forklift truck was parked nearby.

Plaintiff testified that the foreman told him to get on the forks of the lift. He was then lifted to the roof of the building, where he retrieved the clamp, which he placed across the forks. He then crouched with both feet on one of the forks to be lowered to the ground, holding to the top part of the fork carriage.

The roof was 24 to 25 feet high. When plaintiff had been lowered to a level of from 14 to 20 feet from the ground he saw the lift chain "build up and take in slack." According to his testimony, the forks upon which he was standing immediately "fell from under him" and then stopped. Meanwhile, plaintiff lost his grip on the carriage and fell between the forks.

According to the foreman who was operating the forklift, the fork carriage "dropped" from three to four feet, commencing at about the 15-foot level.

(4) *Subsequent inspections, tests and alterations.*

Immediately after the accident one of the other workmen on the job, a mechanic, observed that one of the "trips" on the same "latch" which had previously been repaired by welding "appeared to be out of line."

The equipment was subsequently examined by a consulting engineer on behalf of the plaintiff. There was testimony from which the jury could have found that defendants' representatives gave plaintiff's engineer the impression that the equipment was still in the same condition as at the time of the accident. In fact, it had been substantially altered, principally by the substitution of heavier and stronger cross-members in the tower structure and by the straightening and rewelding of the channel support plate.

Without knowing of these changes plaintiff's engineer found a defect involving interference by a cross-

member bolt head with a latch pin, which he concluded was a probable cause of the accident. He also experimentally duplicated a "free fall" of the forks carriage.

Later, after the alterations became known and an attempt was then made by Hyster to restore the equipment to its original condition, plaintiff's engineer performed a second inspection. At that time he did not find the interference between bolt head and latch pin. He stated that a deflection or distortion of the upright members could have caused the accident. He also stated that the subsequent strengthening of the cross-members by Hyster would have stiffened the channel, making it less likely to twist. He testified, however, that because of the alterations he was unable to say which of the "scientifically probable" causes was the one most likely to have caused the accident.

The equipment was also examined by defendants' engineers. One of them testified that damage to the channel support plate had probably been caused by the inner upright dropping far enough and repeatedly enough before proper repairs were made to a defective latching mechanism.

I. *The court did not err in denying defendants' motions for nonsuit and directed verdict.*

■ Defendants assign as error the denial of their motions for nonsuit and directed verdict. The denial of those motions was proper, of course, if there was any substantial evidence to sustain a verdict by the jury on either a theory of negligence or strict products liability.

Defendants claim that the only theory of negligence available to the plaintiff is res ipsa loquitur. They then argue that the requirements for application of that theory, as set forth in *Pattle v. Wildish*

*Construction Co.,* 270 Or 792, 529 P2d 924 (1974), were not satisfied. Specifically, they contend that the instrumentality was not in the exclusive control of the defendants and that the accident would not have happened but for plaintiff's action of voluntarily riding upon the bare forks.

■ In this case, however, the trial court withdrew the theory of res ipsa loquitur from consideration by the jury. In any event, after examining the record, we hold that wholly aside from any theory of res ipsa loquitur there was substantial evidence to support a finding by the jury that defendants were negligent in the maintenance of the equipment, if not in its original design and manufacture. This consisted of evidence from which the jury could properly find that there had been similar malfunctions of the equipment on previous occasions; that defendants' mechanics had undertaken to repair the equipment· so that this would not happen again; that they had failed to make proper repairs, but had nevertheless assured the lessee that the equipment had been restored to good operating condition. Cf. *Hickman v. Haughton Elev. Co.,* 268 Or 192, 519 P2d 369 (1974).

■ Defendants also contend that the evidence was insufficient to support recovery on a theory of strict products liability; that there was not "a scintilla of evidence of product defect"; and that "Hyster had no way of anticipating Medford Construction Company would direct its employee to follow an obviously unsafe practice" by riding on the bare forks of the lift. In support of these contentions defendants cite *Askew v. Howard-Cooper Corp.,* 263 Or 184, 502 P2d 210 (1972), a "defective design" case.

In *Askew* the plaintiff was injured while greasing a log handling machine manufactured by defendant. Numerous fittings on the machine required daily greasing. To grease those on the boom the plain-

tiff would lower the boom to a height of 10 feet and then crawl out upon it. In doing so he slipped, fell and was injured. Grease and oil tended to accumulate on the boom and make it slippery. There was evidence that plaintiff could have serviced all of the boom fittings from a platform if he had lowered the boom to a lesser height.

Under these facts this court affirmed the granting of an involuntary nonsuit. In so holding this court (at 263 Or 188) stated the following test, quoting from Restatement of Torts 2d § 402A, Comment i (1965):

"In order to be unreasonably dangerous so as to substantiate strict liability on the part of the seller, it must be shown that '[t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' "①

The court held in *Askew* that this test was not

---

① This is not inconsistent with the following test for liability under § 402A as subsequently stated in *Phillips v. Kimwood Machine Co.*, 269 Or 485, 525 P2d 1033, 1036 (1974), another "defective design" case:

"A dangerously defective article would be one which a reasonable person would not put into the stream of commerce *if he had knowledge of its harmful character*. The test, therefore, is whether the seller would be negligent if he sold the article *knowing of the risk involved*. Strict liability imposes what amounts to constructive knowledge of the condition of the product." (Emphasis in original.)

There this court explained what might appear to be a disparity between the two standards by quoting with approval from *Welch v. Outboard Marine Corp.*, 481 F2d 252, 254 (5th Cir 1973):

" 'We see no necessary inconsistency between a seller-oriented standard and a user-oriented standard when, as here, each turns on foreseeable risks. They are two sides of the same standard. A product is defective and unreasonably dangerous when a reasonable seller would not sell the product if he knew of the risks involved *or if the risks are great-*

satisfied in that case because the grease fittings were safely and easily accessible to the plaintiff without climbing on the slippery boom. In this case, however, whenever the forklift was used for its contemplated purpose of lifting either material or personnel the falling of the upright stages or forks would create a danger either to those on the forks or on the ground and regardless of whether the passenger rode on the bare forks or on a platform. The boom in *Askew* was not meant to be walked on, but the forklift in this case was meant to lift objects and it did so defectively.

Thus, plaintiff does not contend that Hyster failed to design and manufacture the machine so that he could ride on the forks without falling off (by analogy to *Askew*). Plaintiff contends that this machine was defectively designed and manufactured because it allowed either the forks or the "uprights" to suddenly drop, causing anything that happened to be on the forks to be thrown to the ground.

As stated in *Dunham v. Vaughan & Bushnell Manufacturing Co.*, 42 Ill 2d 339, 247 NE2d 401, 403 (1969), previously quoted by this court with approval in *Markle v. Mulholland's, Inc.*, 265 Or 259, 269, 509 P2d 529 (1973):

> "Although the definitions of the term 'defect' in the context of products liability law use varying language, all of them rest upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function. * * *"

---

er than a reasonable buyer would expect.'" (Emphasis added.)

To the same effect see *Askew v. Howard-Cooper Corp.*, 263 Or 184, 502 P2d 210 (1972). See also *Heaton v. Ford Motor Co.*, 248 Or 467, 471-72, 435 P2d 806 (1967).

For these reasons the jury could properly find that this forklift was dangerously defective and the trial court did not err in denying defendants' motions for nonsuit and directed verdict.

II. *The exclusion of the Oregon Basic Safety Code was not prejudicial error.*

Defendants assign as error the failure of the court to admit into evidence and instruct the jury upon the following provisions of the Oregon Basic Safety Code:

"8-1-2 'Industrial Type Vehicles' shall mean tractors designed primarily for pulling one or more non-powered trucks, trailers or other mobile loads, *low and high lift trucks* commonly referred to as *fork lift trucks,* straddle trucks such as lumber carriers, and any other type of self-powered vehicles especially designed for handling materials primarily within the boundaries of a place of employment, except where otherwise specifically covered.

"* * * * *

"8-2-12 No one but the operator shall be permitted to ride on industrial vehicles *unless safe riding facilities are provided* for each additional person authorized to ride." (Emphasis added.)

Defendants contend as follows:

"The Basic Safety Code prohibits employees from riding on the forks. The Code was relevant on five issues: (a) As evidence of those uses of the product by the purchaser which the manufacturer might reasonably anticipate; (b) As evidence of the standard of care imposed upon plaintiff and the reasonableness of his conduct; (c) As evidence of the duty imposed upon third parties, in this instance Medford Construction Company, the plaintiff's employer, and the reasonableness of the employer's conduct in either directing or permitting a violation of the Code; (d) As a necessary adjunct to the standard instruction in negligence cases that

every person has a right to assume other persons will obey the law; and (e) As evidence contradictory to plaintiff's evidence that riding the bare forks was a custom and usage common to the construction industry."[2]

### A. *Anticipated use of forklift.*

■ We may assume, without deciding, that because plaintiff alleged, among other things, that this forklift truck was defectively designed these provisions of the safety code, insofar as they related to the conditions under which this equipment would be used, were relevant to the issue arising from defendants' contention that it was entitled to offer evidence to show "the use of the product by the purchaser which the manufacturer might reasonably anticipate." See *Phillips v. Kimwood Machine Co., supra* at 1344. It does not necessarily follow, however, that it was prejudicial error to exclude from evidence these provisions of the Oregon Basic Safety Code.

In support of the contention of an anticipated use defendants say that:

"There is a difference between a material hoist and a personnel hoist. A personnel hoist such as an elevator has to have certain fail-safe features. * * *"

Defendants offered testimony to the effect that there are "accepted restrictions" against people "riding on the forks" unless "there is a seat provided for them" and that this is a "restrictive standard that is accepted" in the designing of lift trucks.

Although this forklift truck was not a "person-

---

[2] Plaintiff contends that this court should not consider this assignment of error because defendants never offered the safety code in evidence. Because, however, the trial court stated that it would not be admitted in evidence, we will consider this assignment of error on its merits.

nel hoist," ample evidence was received without objection that Hyster knew or should have known that it might well be used as a "hoist" for people, as well as material objects. Even under provisions of the Basic Safety Code it is proper for persons to ride on forklift carriages when "safe riding facilities are provided." The first use of this forklift truck was to "hoist" television cameras and operators for the filming of a golf tournament, presumably with "safe riding facilities" by a "special platform." There was also testimony that it is "normal practice" in the construction industry for men to ride on forklifts when a "pallet" or a "platform" is provided to stand on.

It follows from the evidence received without objection that Hyster knew or should have known that this forklift truck might well be used to "hoist" people when pallets, platforms, seats or other "safe riding facilities" were provided, and that this was one of the "uses" or "risks" for which the equipment should be safely designed, including the design of such "fail-safe features" as would prevent either the forklift carriage or "uprights" from "falling," as in this case, for the reason that in such an event people riding on the fork carriage might well be injured even if standing on a pallet or platform or seated in a seat.

In addition, evidence was received without objection that it is customary or "standard practice" in the construction industry for forklifts to be used to "take people up and down," even when "riding the bare forks." Indeed, the manager of defendant Hyster Sales testified that he was aware in 1970 that men occasionally rode the forks of Hyster units on "lots of jobs."

Finally, evidence was received to the effect that despite such a "custom" or "practice" in the construction industry, it is "against the law" and "against the

safety code" to "ride the forks"; that to do so is considered to be a "serious violation"; and that there is a "safety regulation" against doing so.

In this state of the record we hold that even assuming that the written safety code p r o v i s i o n s against riding on forklifts without "safe riding facilities" may have had some probative value on the issue of the uses and risks to be anticipated by Hyster in the design of this equipment, no substantial prejudice was suffered by defendants as a result of the exclusion of that evidence upon the issue of the anticipated use of this forklift.

### B. *Contributory negligence.*

As previously noted, defendants' purpose in offering this safety regulation was not limited to the issue of the uses and risks which the defendants should have reasonably anticipated in the design of this equipment, but extended to the issue of plaintiff's contributory negligence and the negligence of his employer, whose foreman instructed plaintiff to "ride the forks" at the time of his injury.

■ We have previously held that contributory negligence, as such, is not a defense to plaintiff's count for products liability under § 402A. *Findlay v. Copeland Lumber Co.*, 265 Or 300, 304-05, 509 P2d 28 (1973). Evidence of contributory negligence was, however, admissible on plaintiff's alternative count for negligence.

■ Although provisions of the Oregon Basic Safety Code establish a standard of care for employers, we have held that the code was adopted for the protection of employees, with the result that the use of its provisions "to measure the conduct of an employee would defeat the obvious purpose of the act." *Hillman v. North Wasco County PUD,* 213 Or 264, 290-91,

323 P2d 664 (1958). See also *Rich v. Tite-Knot Pine Mill,* 245 Or 185, 200, 421 P2d 370 (1966); *Davis v. Angell,* 218 Or 443, 449, 345 P2d 405 (1959); *Snyder v. Prairie Logging Co., Inc.,* 207 Or 572, 580, 298 P2d 180 (1956); *Downey v. Traveler's Inn,* 243 Or 206, 213, 412 P2d 359 (1966); and Restatement of Torts 2d § 286 Comment on clause (a) (1965).[9]

### C. *Negligence of plaintiff's employer.*

■ Even if the provisions of the safety code were relevant to the question whether plaintiff's employer was negligent in that its foreman directed plaintiff to "ride on the forks," that question was only collaterally involved in this case and was virtually admitted. Moreover, the subsequent negligent conduct of such a third party cannot insulate a prior negligent actor from liability when the conduct of both was a substantial factor in producing harm. *Kuhns v. Standard Oil Co.,* 257 Or 482, 493-95, 478 P2d 396 (1971); *Hills v. McGillvrey,* 240 Or 476, 483, 402 P2d 722 (1965). See also *Strandholm v. General Construction Company,* 235 Or 145, 158-59, 382 P2d 843 (1963).

### D. *Custom and usage.*

■ Defendants also contend that these provisions of

[9] *Lovins v. Jackson,* 233 Or 369, 378 P2d 727 (1963), cited by defendants, does not hold to the contrary, despite its statement (at 375) that "the legislature intended the safety codes to be standards of care," in that this court states in *Lovins* (at 374-75) that the Basic Safety Code "established a standard of care for *employers*" and did not extend that standard to employees.

Defendants' brief makes no direct contention that misuse or abnormal use of the forklift (as distinguished from contributory negligence) provided a defense in this case as an action for strict products liability. See *Findlay v. Copeland Lumber Co.,* 265 Or 300, 304-05, 509 P2d 28 (1973), citing Restatement of Torts 2d § 402A, Comment h (1965). Assuming, however, that the Basic Safety Code may have had some probative value upon that question, evidence was received, and without objection, as previously stated, that for an employee to "ride the forks" was "against the law" and "against the safety code" and that there was a "safety regulation" against doing so.

the Basic Safety Code were admissible to rebut testimony offered by plaintiff that riding the bare forks was a custom and usage common to the construction industry. Assuming, without deciding, that such evidence would have been proper if offered for that purpose, we find nothing to indicate that after the court ruled during plaintiff's case that defendants could not prove the provisions of the safety code there was any subsequent offer of these provisions during defendants' case for the purpose of rebutting plaintiff's testimony of custom and practice. In any event, we hold that any such error was not prejudicial because, among other reasons previously stated, it was made clear to the jury by other evidence that it was "against the law" and "against the safety code" to "ride the forks" and that there was a "safety regulation" against doing so.[4]

### E. *Failure to instruct.*

■ Defendants also assign as error the failure of the trial court to instruct upon the Basic Safety Code. The instructions requested were to the effect that the code provisions were "conclusive evidence of negligence," or "conclusive evidence of negligence on the part of the employer," or "conclusively presumed to be reasonable * * * and to fix a reasonable and proper standard and requirement of safety."

Because the safety code provisions could not properly be considered by the jury on the issue of

---

[4] In support of defendants' contention that the Basic Safety Code was admissible to rebut plaintiff's evidence of custom and practice defendants cite *Robbins v. Steve Wilson Co.*, 255 Or 4, 463 P2d 585 (1970), as holding that evidence of a custom contrary to provisions of the Basic Safety Code cannot be received or considered. In that case, however, this court held (at p 12) that although such evidence was inadmissible on the issue whether the defendant violated a provision of the Basic Safety Code, such evidence was admissible on a separate issue as presented in that case whether defendant was negligent in failing to act as a reasonable and prudent employer.

plaintiff's contributory negligence and because the negligence of plaintiff's employer was not a defense if it concurred with defendants' negligence, the trial court did not err in refusing to give these instructions as requested or without modifications necessary to prevent confusion by the jury on these questions. No instruction was requested that these code provisions be considered by the jury on the question of anticipated product use or misuse in the design of this equipment.

III. *The court did not err in instructing on the effect of concurring negligence.*

Defendants assign as error an instruction that "when the negligence of two or more *persons* concurs in proximately causing the damage to *another,* each such person is liable for the entire damage * * *."

Defendants' exception at the time of trial was that concurrent negligence of two or more *parties* refers to a situation where both are "parties before the court and it doesn't refer to the situation of third party negligence"; that "maybe it's the right instruction but the wrong case"; and that it was "purely abstract" and "to that extent constitutes error."

■ Defendants have contended, however, that the cause of plaintiff's injuries was the negligence of his own employer, who was not a party to this case. The instruction specifically refers to "two or more persons," not "two or more parties." The rule that a defendant is not relieved from liability for his negligence by the negligence of another which concurs in causing injury to a plaintiff, as previously discussed, applies equally whether or not the other negligent person is a party defendant in such an action. See *Escobedo v. Ward,* 255 Or 85, 91, 464 P2d 698 (1970); and Restatement of Torts §§ 875, 879, Comment *a* (1939).

On this appeal defendants contend that this instruction was improper because the effect of third

party negligence was covered by separate instructions and

"* * * Thus, the jury could only conclude the instruction on concurrent negligence was applicable to parties before the court, namely, the plaintiff and defendant and, as such, the instruction is inconsistent with the law of contributory negligence which makes any negligence of the plaintiff a complete defense."

Not only was no such exception taken on trial to this instruction, but the instruction, by its terms, clearly refers to the negligence of "two or more persons" causing damage to "another." The trial court did not err in denying defendants' exception to this instruction.

IV. *The trial court did not err in submitting alternative theories of recovery.*

Finally, defendants assign as error the denial of their motion to require plaintiff to elect between "proceeding on a theory of free fall of the forks or a drop of the intermediate upright without a free fall of the forks."

We have examined the record and find that there was substantial evidence to support both theories. It would serve no useful purpose to discuss the evidence in detail.

The fact that such theories of recovery may have been inconsistent did not of itself entitle defendants to require plaintiff to make such an election where, as in this case, plaintiff could not be certain whether a "free fall of the forks" or a "drop of the intermediate upright" was the actual cause of the accident. *Jones v. Howe-Thompson, Inc.,* 143 Or 337, 342-43, 22 P2d 502 (1933). This is particularly true where, as in this case, changes were made in the equipment following the accident and defendants were in a better

position to determine the cause of the accident by inspection of the equipment which they had designed and manufactured. Cf. *Turney v. Southern Pacific Co.,* 44 Or 280, 298, 75 P 144, 76 P 1080 (1904). See also *In re Reuben G. Lenske,* 269 Or 146, 523 P2d 1262, 1268 (1974), and *Clubb v. Hanson,* 272 Or 236, 536 P2d 528 (1975). The trial court did not err in denying the motion for election.

Finding no error, the judgment of the trial court is affirmed.