Argued June 1, affirmed August 20,
reconsideration denied November 15, 1979,
petition for review denied January 3, 1980 (288 Or 253)

DAVIS,
*Appellant,*

*v.*

PACIFIC DIESEL POWER CO.,
*Respondent.*

(No. A7707-10376, CA 10715)

INSLEE,
*Appellant,*

*v.*

PACIFIC DIESEL POWER CO.,
*Respondent.*

(No. A7706-07914, CA 10688)

DENMON,
*Appellant,*

*v.*

PACIFIC DIESEL POWER CO.,
*Respondent.*

(No. A7708-11863, CA 10715)

BOOKER,
*Appellant,*

*v.*

PACIFIC DIESEL POWER CO.,
*Respondent.*

(No. A7708-1164, CA 10715)

(Cases Consolidated.)

598 P2d 1228

William A. Gaylord, Portland, argued the cause for appellant Gordon Inslee. With him on the brief were Gaylord & Thomas, Portland; Jack Ofelt, Jr., Portland; Franklin, Bennett, Ofelt & Jolles, P.C., Portland; Donald A. Buss, Portland; Buss, Leichner & Barker, Portland; and Richard O. Nesting, Portland.

[598-a]

Will Aitchison, Portland, argued the cause for appellant Elizabeth Davis. With him on the brief were Franklin, Bennett, Ofelt & Jolles, P.C., Portland; William A. Gaylord, and Gaylord & Thomas, Portland; Donald A. Buss, Portland; Buss, Leichner & Barker, Portland; and Richard O. Nesting, Portland.

Donald A. Buss, Portland, filed the brief for appellant Rosie L. Booker. With him on the brief were Buss, Leichner & Barker, Portland; William A. Gaylord and Gaylord & Thomas, Portland; Jack Ofelt, Jr., and Franklin, Bennett, Ofelt & Jolles, P.C., Portland; and Richard O. Nesting, Portland.

Richard O. Nesting, Portland, filed the brief for appellant Alex Denmon. With him on the brief were William A. Gaylord and Gaylord & Thomas, Portland; Jack Ofelt, Jr., and Franklin, Bennett, Ofelt & Jolles, P.C., Portland; Donald A. Buss and Buss, Leichner & Barker, Portland.

Michael A. Lehner, Portland, argued the cause for respondent. With him on the brief was Hershiser, Mitchell, Mowery & Davis, Portland.

Before Lee, P. J., and Gillette and Campbell, Judges.

CAMPBELL, J.

## CAMPBELL, J.

In these consolidated actions for wrongful deaths and personal injuries, plaintiffs appeal from a judgment entered on a jury verdict for defendant. We affirm.

On February 26, 1975, Charles Davis, Gordon Inslee, Alex Denmon, and James E. Booker were working as sandblasters in the hold of an oil tanker under construction by their employer, FMC, in a water berth at Swan Island in Portland, Oregon. Their breathing air was supplied by a bank of four portable diesel-powered air compressors. These air compressors were connected to a common manifold so that compressed air was fed into a single pipe and then through various filtering and drying tanks before going onto the ship. Individual hoses supplied air to the workers' protective blasting hoods. As a result of a fire of unknown cause in the compressor known by FMC as "Compressor No. 2," the lubricating oil inside the compressor ignited, releasing dangerously high amounts of carbon monoxide into the workers' supply of breathing air. Charles Davis and James E. Booker died of carbon monoxide poisoning. Gordon Inslee and Alex Denmon suffered serious injuries, including permanent residual effects.

Defendant Pacific Diesel Power Co. (Pacific Diesel) is a factory representative for General Motors, Detroit Diesel Engines, servicing diesel engines in the Pacific Northwest, including those in the type of compressors used by FMC. Approximately two and one-half months prior to the accident, Pacific Diesel had sold to FMC and installed in Compressor No. 2 a rebuilt diesel engine which defendant had held in stock for several months. As a part of this transaction, defendant transferred the automatic shut-down system from FMC's old engine to the new rebuilt engine. This shut-down system has two main temperature sensing devices: an engine water high temperature switch designed to sense engine temperatures in excess of 205

degrees F.; and an air discharge high temperature switch designed to sense temperatures in excess of 225 degrees F. in the air leaving the compressor. When either of these switches is triggered, the switch should complete an electrical circuit from the battery to an electro-magnetic solenoid, closing a damper inside the blower of the engine, which eliminates the engine's air supply and thus shuts the engine off.

Plaintiffs brought actions against defendant Pacific Diesel in strict liability and negligence. The basis for plaintiffs' count in strict liabilty was that the compressor, and particularly the rebuilt engine, were defective and unreasonably dangerous to plaintiffs in that certain defects in the automatic shut-down system rendered that system inoperable. As a result of those defects, the fire occurred in Compressor No. 2, causing the deaths and injuries of the workers. Plaintiffs' specifications of negligence all alleged defendant's failure in various particulars to return the compressor to FMC with a functional shut-off system. During the trial, the court granted defendant's motion to strike the strict liability counts from all four complaints. The jury returned a verdict for defendant on the count in negligence. Plaintiffs raise seven assignments of error.

First, plaintiffs argue that the trial court erred in denying plaintiffs' post-trial motions for new trials based on jury misconduct. The specific "misconduct" alleged here in affidavits and in a post trial hearing took three forms. First, despite the trial court's proper instructions, the jury apparently misunderstood the law of concurrent causation, believing that it could find defendant liable only if its negligence was the "preponderant" or primary cause, rather than merely a contributing or substantial cause, of the deaths and injuries. *See, e.g., Rice v. Hyster Co.,* 273 Or 191, 540 P2d 989 (1975); Restatement (Second) of Torts § 431 (1965). Prior to reaching this misunderstanding, the jury had found defendant negligent in two respects

and found that such negligence caused the deaths and injuries complained of. Second, there were allegations that racial prejudice against three of the four plaintiffs was a factor in the minds of some of the jurors. Third, concern for unemployment resulting from a verdict against defendant allegedly affected the deliberations of some members of the jury.

■ "Confusion or misunderstanding of instructions is not misconduct justifying a mistrial." *Biegler v. Kirby,* 281 Or 423, 429 P2d 1127 (1978). In *Carson v. Brauer,* 234 Or 333, 382 P2d 79 (1963), the court held that the only types of jury misconduct which justify a new trial are conduct in the nature of fraud, bribery, coercion, or obstruction of justice. Racial prejudice and concern for unemployment do not fit these categories. The trial court did not err in denying plaintiffs' motions for a new trial on the basis of jury misconduct.

■ ■ Plaintiffs next contend that the trial court erred in denying plaintiffs' motions for directed verdicts on the issues of defendant's negligence and causation. We give defendant the benefit of all conflicts in the evidence, as well as all favorable inferences which can reasonably be drawn from the evidence. *Rice v. Hyster Co., supra.* In order to find for plaintiffs we must conclude that reasonable men could draw only one conclusion from the evidence. *James v. Carnation Co.,* 278 Or 65, 562 P2d 1192 (1977).

■ Plaintiffs' complaints alleged seven specifications of negligence, four of which were the subject of the motions for directed verdict:

1. Defendant's "returning to the Plaintiff's employer, for the plaintiff's use, a compressor unit which had an inoperable engine water high temperature switch";

2. Defendant's failure "to properly test the automatic shut-down system in December of 1974 . . . thus allowing the unit to return to the Plaintiff's employer and the Plaintiff with an automatic shut-down system that did not work properly";

3. Defendant's "causing the arm and/or plunger on the solenoid to become bent when the Defendant, Pacific Diesel, worked on the compressor unit in December of 1974, thus rendering the automatic shut-down mechanism inoperatable"; and

4. Defendant's failure "to properly wire the safety switches on the automatic shut-off system except the high temperature discharge switch, thus rendering those switches ineffective."

One of plaintiffs' expert witnesses testified that the malfunction in the engine water high temperature switch was caused by engine vibration over an indeterminable, but not necessarily long, period of time. The witness was unable to state an opinion on the operability of the switch on December 10, 1974, when the compressor was returned by defendant to FMC. FMC employes testified that the automatic shut-down system was not subjected to periodic preventive maintenance as specified in the maintenance manual. From this evidence a jury would be entitled to infer that any defect in the engine water high temperature switch occurred after defendant returned the compressor to FMC.

There is also evidence from which a jury could believe that defendant checked the automatic shut-down system prior to returning the compressor to FMC. Defendant's mechanic testified that he did not recall testing the internal or mechanical function of the individual switches in the shut-down system. He did testify, however, that while wiring the lube oil pressure switch, he accidently caused the solenoid to be activated, shutting the engine down. Although the evidence suggests that such 'testing' does not comport with defendant's company policy regarding testing of the shut-down system or with procedures outlined in the maintenance manual, whether this procedure was negligent is a jury question. *See, e.g., Oregon Auto Ins. Co. v. Fitzwater,* 271 Or 249, 531 P2d 894 (1975).

[602]

There is evidence from which a jury could believe that defendant did not cause the arm or plunger on the solenoid to become bent, rendering the shut-down system inoperable. As stated above, defendant's mechanic testified that the solenoid operated when he accidentally activated it while wiring the lube oil pressure switch. There was a delay of several months between the accident and the time when plaintiffs' expert took the solenoid for examination. That expert could not recall whether the plunger was in the same condition at the later time as it was in when he first observed it the day following the accident. He testified that the plunger apparently was bent further in the mail in March 1977. FMC's maintenance foreman testified that it would be possible for the solenoid to be bumped. There was also testimony that the solenoid connecting arm could be bent if bumped. There was evidence that during the inspection of the compressor immediately following the accident the solenoid was removed from the engine and force was applied to the solenoid connecting arm. Although there was testimony suggesting the bend in the solenoid connecting arm was present when defendant returned the compressor to FMC, the contrary evidence was sufficient to take the issue to the jury.

There is uncontroverted evidence and expert testimony that at the time of the inspection of the compressor following the accident, the engine water high temperature switch was improperly wired to the solenoid so that it could not activate the solenoid. The evidence is also uncontroverted that: the shut-down system had no cause to operate between December 10, 1974, and February 26, 1975; nobody altered the wiring or any other aspect of the shut-down system between those dates; and the shut-down system was not tampered with between the time of the accident and the time of the examination of the compressor. Even if the inference were inescapable that the shut-down system was inoperable because of improper wiring or otherwise, however, the trial court did

[603]

not err in refusing to grant plaintiffs a directed verdict on the issue of negligence. There was evidence from which the jury could have found that defendant's acts were not a substantial cause of the injuries and deaths. *See* Restatement (Second) Torts § 433 (1965). The jury could have found that FMC was negligent in using the compressor for breathing supply without equipping it with a carbon monoxide alarm, or a high temperature alarm along with frequent testing, as required under an OSHA regulation. The jury could also have found FMC negligent in failing to perform regular preventive maintenance on the shut-down system as prescribed in the maintenance manual.

The jury could also have found that the deaths and injuries were not a foreseeable result of defendant's actions. Defendant had no actual knowledge that the compressors were being used by FMC to supply breathing air to workers. The absence from the compressor of the safety devices required by the OSHA regulation is also a factor from which a jury might infer that the use of the compressor to supply breathing air was not foreseeable to defendant. Although there was evidence as to the use of such compressors in Portland and the Pacific Northwest to supply breathing air to workers, the question of foreseeability was for the jury. We conclude that the trial court's ruling was not in error.

■ Plaintiffs next argue that the trial court erred in granting defendant's motion to strike plaintiffs' counts in strict liabilty. In order for plaintiffs to have prevailed on their count in strict liability they must have proved, *inter alia,* that defendant sold FMC a product that was defective and unreasonably dangerous. *See, e.g., Allen v. The Heil Company,* 285 Or 109, 589 P2d 1120 (1979); Restatement (Second) Torts § 402A (1965). Here, defendant's actions included both a sale of a rebuilt engine for the compressor and the installation of the engine in the compressor.

■ In *Hoover v. Montgomery Ward & Co.,* 270 Or 498, 528 P2d 76 (1974), the court analyzed a similar

situation. There, the defendant sold the plaintiff's husband a tire, placed the tire on the spare wheel, and mounted the wheel on the car. Plaintiff was subsequently involved in a one-car accident which gave rise to the litigation. She contended that the accident was a result of defendant's failure to tighten the lug nuts properly. Plaintiff brought an action in strict liability, contending that the "product" sold by defendant to her husband was not only the tire but also the proper installation of the tire on the car. There was no contention that the tire was defective. The court held that the trial court did not err in refusing to submit the issue of strict liability to the jury, stating:

> "In the instant case it is obvious that the product sold to plaintiff was not dangerously defective. Even if we accepted plaintiff's version of the cause of the accident, it was not a dangerously defective tire which caused plaintiff's injuries, but rather the installation of the wheel on the hub and axle of the auto. In such case it might be said that plaintiff's auto became dangerously defective, but certainly not the tire. Plaintiff herself must have recognized this feature, because in her complaint she does not allege that the tire was an unreasonably dangerous product but that 'the automobile was unreasonably dangerous for its intended use * * *.'" 270 Or at 502-03.

Here, plaintiffs do not contend that the product sold to FMC by defendant, the rebuilt engine, was defective. Rather, their complaints allege that as a result of defendant's failure to install a functional shut-off system, which it had merely transferred from the old engine, "the compressor unit was dangerously defective and unreasonably dangerous." This is the same argument rejected in *Hoover v. Montgomery Ward & Co., supra. See also, e.g., Lemley v. J & B Tire Co.,* 426 F Supp 1378 (W.D. Pa. 1977); *Hoffman v. Simplot Aviation, Inc.,* 97 Id 32, 539 P2d 584 (1975). We conclude that the trial court's ruling striking plaintiffs' strict liability counts was not in error.

■ Plaintiffs next assign error to the trial court's refusal to give the following requested instruction:

"In order for a product to be legally defective and unreasonably dangerous, it is not necessary that its supplier should have foreseen or expected the particular chain of events by which it caused harm to Plaintiffs. If a reasonably prudent supplier would have foreseen *some* harm resulting from the defect, and with that knowledge would have declined to market the product, the product is unreasonably dangerous; even though the actual mechanism of the eventual harm might not have occurred to him."

This instruction, couched in language ordinarily used when discussing strict liability, would have been improper where the issue of strict liability was taken from the jury. The trial court, therefore, did not err in refusing to give this instruction.

■■ Next, plaintiffs argue that the trial court erred in instructing the jury regarding the following regulation of the Occupational Safety and Health Administration and Oregon State Occupational Safety and Health Code:

"If an oil lubricated compressor is used to supply breathing, it shall have a high temperature alarm or a carbon monoxide alarm. If a high temperature alarm is used, the air shall be frequently tested for carbon monoxide to assure that the carbon monoxide content does not exceed twenty parts per million."

The court further instructed the jury:

" * * * [T]his regulation may be considered by you on the question of whether the defendant could reasonably foresee that the air compressor would be used by FMC for breathing purposes."

The appellate courts of this state have not previously ruled on the propriety of instructing the jury that the existence of certain safety regulations may be considered on the question of whether a defendant could reasonably foresee a particular use of a product. In *Rice v. Hyster Co.,* 273 Or 191, 540 P2d 989 (1975), in an analogous situation the court assumed without deciding that evidence of such safety regulations would have some probative value as to "the use of the

product by the purchaser which the manufacturer might reasonably anticipate." 273 Or at 202. The court in that case pointed out that neither party requested an instruction that the jury could consider the perti-- nent safety provisions on the issue of foreseeable use of the product.

As the trial court instructed the jury, " [e]very person has the right to assume that others will obey the law unless and until such person knows or should in the exercise of reasonable care know to the contrary." *See Smith v. Holst,* 275 Or 29, 549 P2d 671 (1976). We conclude that the existence of the safety regulation could properly be considered by the jury in determining the foreseeable use of the compressor, and the trial court did not err in so instructing the jury.

Next, plaintiffs assign as error the trial court's denial of plaintiffs' motion for directed verdict on the issue of defendant's claim of misuse of the compressor. Since misuse is pertinent only as a defense to strict liability, and plaintiffs' counts in strict liablility were striken, this issue is moot.

Finally, plaintiffs argue that the trial court erred in denying plaintiffs the opportunity to argue to the jury the issue of burden of proof and legal causation. Counsel for plaintiff Davis attempted to explain the meaning of "preponderance of the evidence" as follows:

" * * * [T]he preponderance of the evidence is basically the greater weight of the evidence. That means the plaintiff, to win any amount at all, need only to prove that issue by the greater weight of the evidence. All he has to do is tip the scales. And if it is in his favor the plaintiffs win. He doesn't have to sink the boat, so to speak. All he has to do is tip that scales for the greater weight of the evidence."

At that point the trial court sustained defendant's objection that the argument was within the court's province. Later, counsel for plaintiff Inslee attempted

to explain to the jury the law of concurrent causation, but was instructed by the court to abandon that subject.

The scope and content of argument to the jury is largely subject to the discretion of the trial court. *Troutman v. Erlandson,* 279 Or 595, 569 P2d 575 (1977). It is the trial court's function, not that of counsel, to instruct the jury on the law. *Mason v. Allen et al,* 183 Or 638, 195 P2d 717 (1948). Plaintiffs do not argue that the trial court gave improper instructions on burden of proof or concurrent causation. We conclude that the trial court did not abuse its discretion in curtailing the argument of counsel to the jury.

Affirmed.